**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| ANGELICA R., | ) | NO. CV 19-4191-E |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| ANDREW SAUL, Commissioner of | ) | **AND ORDER OF REMAND** |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Pursuant to sentence four of 42 U.S.C. section 405(g), IT IS
HEREBY ORDERED that Plaintiff's and Defendant's motions for summary
judgment are denied, and this matter is remanded for further
administrative action consistent with this Opinion.


**PROCEEDINGS**


Plaintiff filed a complaint on May 14, 2019, seeking review of
the Commissioner's denial of benefits.  The parties consented to
proceed before a United States Magistrate Judge on June 7, 2019.
Plaintiff filed a motion for summary judgment on September 19, 2019.

Defendant filed a motion for summary judgment on October 28, 2019.
The Court has taken the motions under submission without oral
argument.  See L.R. 7-15; "Order," filed May 16, 2019.

**BACKGROUND**

Plaintiff asserts disability since November 29, 2009, based on
allegations of, inter alia, fibromyalgia, herniated discs, anxiety,
depression, panic attacks, "ADHD" (attention deficit hyperactivity
disorder), and chronic pain in her right hand, wrists, ankles, back,
hips, right knee, legs and right foot (Administrative Record ("A.R.")
37, 46-47, 222, 226, 246, 304).  Rheumatologist and Qualified Medical
Examiner ("QME") Dr. Allen I. Salick diagnosed fibromyalgia syndrome
based on the 2010 American College of Rheumatology criteria for
diagnosis (A.R. 483).  Dr. Salick opined that Plaintiff cannot sit for
more than 10-15 minutes at a time or stand/walk for more than 30
minutes at a time without pain, has difficulty grasping, gripping,
lifting, carrying, twisting, bending, stooping and squatting, and
cannot be in an air conditioned room (A.R. 487; see also A.R. 474-75).
Other workers compensation treating and examining doctors also found
Plaintiff incapable of performing light work.  See A.R. 356-57
(chiropractor/QME Henry Kan's opinion); 452-53 (treating orthopedic
surgeon Dr. Bal Rajagopalan's opinion); 645-46 (orthopedic surgeon/QME
Dr. Daniel M. Silver's opinion); see also A.R. 573 (treating spine
surgeon Dr. Sam Bakshian's opinion, which included a 25 pound lifting
capacity, but with profound restrictions on standing, walking and
other activities).
///

An Administrative Law Judge ("ALJ") reviewed the record and heard testimony from Plaintiff and a vocational expert (A.R. 33-81). The ALJ found that Plaintiff has "severe" degenerative disc disease, lumbar spine arthritis, history of lumbar strain/sprain and anxiety disorder (A.R. 20). However, the ALJ found that Plaintiff's alleged fibromyalgia was not a medically determinable impairment (A.R. 20).[1]

The ALJ deemed Plaintiff capable of performing a range of light work, limited to: (1) frequent climbing of ramps and stairs; (2) occasional climbing of ladders, ropes and scaffolds; (3) occasional balancing, stooping, kneeling, crouching, crawling and overhead reaching with the right upper extremity; and (4) avoidance of environmental irritants and temperature extremes. The ALJ found that Plaintiff is capable of "performing simple and routine tasks and complex tasks," interacting and responding appropriately with supervisors, co-workers and the public, and adjusting to routine changes in the workplace. See A.R. 21-26 (adopting consultative examiners' functional capacity determinations at A.R. 600-01 and 608, which are slightly more restrictive than the State agency physician's residual functional capacity determination on initial review at A.R. 91-92). The ALJ identified certain light jobs Plaintiff assertedly could perform, and, on that basis, denied disability benefits (A.R. 26-27 (adopting vocational expert testimony at A.R. 75-77)). The Appeals Council denied review (A.R. 1-4).

///

---

[1]     The ALJ failed to discuss why the ALJ also found that Plaintiff's alleged depression and chronic pain were not "severe" impairments. See A.R. 20.

# STANDARD OF REVIEW

Under 42 U.S.C. section 405(g), this Court reviews the Administration's decision to determine if: (1) the Administration's findings are supported by substantial evidence; and (2) the Administration used correct legal standards. See Carmickle v. Commissioner, 533 F.3d 1155, 1159 (9th Cir. 2008); Hoopai v. Astrue, 499 F.3d 1071, 1074 (9th Cir. 2007); see also Brewes v. Commissioner, 682 F.3d 1157, 1161 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation and quotations omitted); see also Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).

> If the evidence can support either outcome, the court may
> not substitute its judgment for that of the ALJ. But the
> Commissioner's decision cannot be affirmed simply by
> isolating a specific quantum of supporting evidence.
> Rather, a court must consider the record as a whole,
> weighing both evidence that supports and evidence that
> detracts from the [administrative] conclusion.

Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and quotations omitted).

///

///

///

///

**DISCUSSION**

Plaintiff contends, <u>inter alia</u>: (1) the ALJ erred in the evaluation of opinions from the workers compensation treating and examining physicians; and (2) the ALJ erred in finding that Plaintiff's alleged fibromyalgia is not a "medically determinable impairment" and in failing to consider limitations from fibromyalgia in assessing Plaintiff's residual functional capacity. The Court agrees.

**I.  Summary of the Relevant Medical Record**

As detailed below, several workers compensation physicians treated or evaluated Plaintiff for various medical conditions throughout the period of alleged disability. With one arguable exception (QME Dr. Mitchell U. Silverman, discussed <u>infra</u> at footnote 7), all of the treating and examining physicians who opined regarding Plaintiff's capacity appeared to believe that, in one respect or another, Plaintiff has a lesser functional capacity than the ALJ assessed.[2]

---

[2]    The record appears to be missing treatment notes from several of Plaintiff's providers and contains incomplete records from other providers (including Dr. Silverman). <u>See</u> A.R. 323-24 (attorney letter listing providers). Plaintiff's counsel informed the ALJ at the administrative hearing that counsel did not have records from rheumatologist Dr. Ellis Assuta or Mid-Valley Pain Management, which assertedly were "critical" for Plaintiff's "biggest issue," her alleged fibromyalgia (A.R. 37, 43-44). The ALJ agreed to keep the medical record open for 14 days (A.R. 44). Even so, the record still contains no treatment records from Dr. Ellis Assuta or from Mid-Valley Pain Management.

5

## A.  Plaintiff's Injury and Initial Treatment

Plaintiff suffered a work related injury on November 29, 2009. The record does not contain any provider's notes from Plaintiff's initial treatment immediately following this injury.  The Court's summary is gleaned from later providers' treatment notes.  Plaintiff was injured while working as a grocery stocker when a pallet fell on her right knee, twisting her right ankle and knocking her back into another pallet, which she held up with her right elbow and wrist while calling for help (A.R. 386).  Her employer's doctor examined Plaintiff on December 2, 2009, and in January of 2010 prescribed medication, crutches, a knee brace and physical therapy, and ordered her off work for three weeks to be followed by only "light duty" (_i.e._, lifting, pushing and pulling up to 25 pounds with use of a splint) (A.R. 387, 539).  However, Plaintiff reportedly was fired when she returned to work on December 24, 2009 (A.R. 387).

## B.  Plaintiff's Workers Compensation Treatment Records

### 1.  Dr. Tepper's Records

In February of 2010, Plaintiff consulted workers compensation treating physician and orthopedic surgeon Dr. Gil Tepper, who prescribed medications and physical therapy and ordered Plaintiff off work for four weeks (A.R. 539).  In March of 2010, Dr. Tepper continued Plaintiff's disability for four more weeks (A.R. 538).
///
///

A progress report from Dr. Tepper dated April 20, 2010, states that Plaintiff's disability should continue for four additional weeks (A.R. 326-29). Plaintiff reported that physical therapy helped her have less pain, but her low back/right knee pain persisted (i.e., she complained of constant moderate lumbar spine pain radiating to her right buttock with numbness and tingling in the right foot, intermittent moderate right wrist pain radiating to the fingers with numbness and tingling, constant moderate right knee pain and popping worsened by standing and walking, and intermittent headaches and insomnia (A.R. 326-27). On examination, Plaintiff reportedly had a slow, cautious gait, limited lumbar spine range of motion, positive straight leg raising, positive right Braggard's test, "hypertonicity to lumbar para vertebral muscles," limited right knee range of motion, positive right knee McMurray test and right knee medial joint line tenderness (A.R. 327). Dr. Tepper diagnosed sprain/strain in the right ankle, right knee, right wrist and lumbar spine, and headaches and insomnia secondary to injuries, for which Dr. Tepper continued Plaintiff's medications and physical therapy (A.R. 327-28). Dr. Tepper also requested approval for lumbar spine and right knee MRIs to rule out disc protrusion and internal derangement (A.R. 327-28).

## 2.   Dr. Rajagopalan's Records

Orthopedic surgeon Dr. Bal Rajagopalan treated Plaintiff from May of 2010 through at least September of 2012 (A.R. 386-471, 617-36). Over the course this treatment, Plaintiff complained of, inter alia, right knee pain and low back pain radiating down to her right foot (A.R. 406, 409, 420, 446, 467, 617, 620, 623, 626, 631, 634), headache

(A.R. 409, 467), insomnia (A.R. 409, 446, 467, 631), right lower extremity numbness and tingling (A.R. 631), and right knee "giving out" and "locking" (A.R. 467, 634). On initial examination in May of 2010, Plaintiff reportedly had tenderness to palpation of the lumbar spine and right knee, positive straight leg raising and positive McMurray tests (A.R. 388-89). Dr. Rajagopalan diagnosed lumbar disc disease with right leg sciatica, right knee internal derangement and insomnia (A.R. 389). Dr. Rajagopalan prescribed Naprosyn, Vicodin and a knee brace, ordered physical therapy and extended Plaintiff's disability for six weeks (A.R. 389). Dr. Rajagopalan also requested approval for MRIs of the lumbar spine and right knee (A.R. 389).[3]

In June of 2010, Dr. Rajagopalan reviewed the MRI studies and diagnosed lumbar disc disease and right knee fibromas, prescribed Naprosyn, ordered chiropractic treatment and extended Plaintiff's disability for six weeks (A.R. 618). In August of 2010, Plaintiff reported improvement from chiropractic treatment (A.R. 620). Dr. Rajagopalan continued Plaintiff's chiropractic treatment and medications, and extended Plaintiff's disability for six weeks (A.R. 621). In September of 2010, after finishing chiropractic treatment, Plaintiff reported slight improvement in her low back, but no improvement in her right knee (A.R. 623). Dr. Rajagopalan ordered

_____

[3]    A May, 2010 lumbar spine MRI showed, inter alia, a 2-millimeter disc protrusion at L4-L5 with facet arthropathy, and a 4-millimeter disc protrusion at L5-S1 abutting the left S1 nerve root (A.R. 396-97). A May, 2010 right knee MRI showed no evidence of internal derangement, and a suspected nonossified fibroma or fibrous cortical defect in the posterolateral tibia metadiaphysis (A.R. 398). From these studies, Dr. Tepper diagnosed herniated nucleus pulposus at L4-L5, L5-S1 and right lower extremity radiculitis (A.R. 615).

more physical therapy, prescribed Vicodin, and extended Plaintiff's
disability for one month (A.R. 624).  In December of 2010, Plaintiff
reported continued low back pain with no improvement (A.R. 406).  Dr.
Rajagopalan ordered more chiropractic treatment, continued Plaintiff's
medications (adding Tizanidine), and extended Plaintiff's disability
for two months (A.R. 407).  Dr. Rajagopalan indicated that he was
awaiting authorization for a referral to a spine surgery specialist
(A.R. 407).

In February of 2011, Plaintiff complained of headaches and
insomnia in addition to low back pain, reporting that she had seen a
spine surgeon who had not recommended surgery (A.R. 409).[4]  Her lumbar
spine reportedly was tender on examination (A.R. 409-10).  Dr.
Rajagopalan diagnosed lumbar disc disease, insomnia and headaches,
continued Plaintiff's Vicodin, requested further evaluation by a spine
specialist, a pain management specialist and an internist (A.R. 410).

---

[4]     Orthopedic surgeon and QME Dr. Daniel M. Silver
examined Plaintiff in November of 2010, reviewed medical records
including nerve conduction studies, and prepared a report dated
March 11, 2011 (A.R. 643-58).  Dr. Silver opined that the studies
suggest bilateral chronic active L5-S1 radiculopathy, bilateral
nerve root impingement at L4-L5 and L5-S1, and right carpal
tunnel syndrome (A.R. 643-44).  Dr. Silver diagnosed right wrist
sprain/strain plus carpal tunnel syndrome, herniated nucleus
pulposus at L5-S1 with bilateral radiculopathy, a 2-millimeter
disc bulge at L4-L5, and right knee fat pad syndrome without
meniscal tear but with generalized synovitis sprain/strain (A.R.
645).  Dr. Silver opined that Plaintiff was "permanent and
stationary," and should have work restrictions of no lifting more
than 15 pounds, no vigorous or repetitive gripping or grasping
with the right upper extremity and no repetitive bending or
stooping, no prolonged standing, squatting, kneeling, stair
climbing or ladder climbing (A.R. 645-46; see also A.R. 659-70
(May, 2011 supplemental report reaching same conclusion upon
review of additional medical records)).

Dr. Rajagopalan also extended Plaintiff's disability for eight weeks (A.R. 410).

In April of 2011, Plaintiff reported increased, intense pain at 8/10 (A.R. 420). Dr. Rajagopalan continued Plaintiff's Vicodin, extended Plaintiff's disability for eight weeks, and noted that Plaintiff was still awaiting approval for evaluation by specialists (A.R. 421).[5] In June of 2011, Plaintiff complained of low back pain with no change, despite having received a lumbar epidural steroid injection (A.R. 626). Dr. Rajagopalan prescribed Vicodin, Naprosyn, Omeprazole and Soma, and extended Plaintiff's disability for eight weeks (A.R. 627). In August of 2011, Plaintiff reported that she was using a TENS unit and attending aquatic therapy with noted improvement (A.R. 440). Dr. Rajagopalan ordered more physical therapy, continued Plaintiff's medications, and referred Plaintiff for a functional

///

///

///

///

---

[5]     Internal medicine specialist and QME Dr. Arthur E. Lipper examined Plaintiff in May of 2011, reviewed medical records, apparently prepared an initial report dated May 12, 2011 (which is not included in the record), and, upon review of additional medical records, prepared a supplemental report dated June 3, 2011 (A.R. 431-39). Plaintiff complained of headaches and insomnia with daytime fatigue and sleepiness, as well as pain in the shoulders radiating to the neck (A.R. 431). Dr. Lipper diagnosed cervicogenic/muscle contraction headaches and insomnia related to Plaintiff's injuries (A.R. 432). In a further supplemental report dated March 20, 2012, Dr. Lipper reported that Plaintiff's sleep habits had improved and opined that there was no evidence of a current sleep disorder based on Plaintiff's Epworth score and symptom complex (A.R. 456).

capacity examination (A.R. 441).[6]

Dr. Rajagopalan prepared a permanent and stationary report dated November 22, 2011, upon review of Kan's functional capacity evaluation (A.R. 444-53). Plaintiff complained of radiating low back pain at 7/10, and difficulty sleeping due to pain (A.R. 446). Dr. Rajagopalan reported Kan's examination results (A.R. 444, 446-49; compare A.R. 339-56), and adopted Kan's functional capacity evaluation (i.e., that Plaintiff was capable of less than light work) (A.R. 452-53).

In June of 2012, Plaintiff complained of low back pain at 7/10 radiating down both legs (A.R. 465). Dr. Rajagopalan prescribed Medrol, requested authorization for referral to a pain management specialist for possible epidural injections and extended Plaintiff's disability for six weeks (A.R. 465). In July of 2012, Plaintiff had

_____

[6]     Chiropractor and QME Henry Kan examined Plaintiff, reviewed medical records, and prepared a functional capacity evaluation dated November 3, 2011 (A.R. 336-60). Plaintiff described her low back, right leg and right foot pain as at 7/10 on average (A.R. 338). Plaintiff reported that she had trouble sleeping due to severe stabbing back pain (A.R. 338). On examination, Plaintiff had an antalgic gait, limited range of motion in the right upper extremity, reduced right grip strength, reduced strength due to severe low back pain, and tenderness to palpation of the lumbar spine with "loss of spinal rhythm" (A.R. 339-52). Kan diagnosed lumbar disc disease, insomnia and headaches for which he considered Plaintiff permanent and stationary (A.R. 353). Kan opined that Plaintiff could: (1) lift up to 15 pounds occasionally and 8 pounds frequently; (2) stand up to four hours per day, sit less than eight hours per day; (3) occasionally climb, balance, stoop, kneel, crouch, crawl and twist; and (4) frequently reach, handle, finger, feel, see, hear and speak (A.R. 356-58). Kan precluded Plaintiff from working on slippery surfaces, right power gripping, repetitive firm gripping and grasping, and "prolonged fine finger manipulation of over 10 minutes continuously" (A.R. 357).

positive right foot plantar fasciitis, positive bilateral straight leg raising, and limited range of motion in the lumbar spine on examination (A.R. 631-32). Dr. Rajagopalan ordered a home exercise program, prescribed Ambien and Vicodin, again referred Plaintiff to a pain management specialist and an internal medicine specialist and extended Plaintiff's disability for four weeks (A.R. 632).

In August of 2012, Plaintiff reported that she had not had physical therapy since 2011, had not had any lumbar spine epidural injections but had received one knee injection (A.R. 467). On examination, Plaintiff had reduced right hand grip strength and tenderness in her knee with pain on flexion and positive McMurray test (A.R. 468). Dr. Rajagopalan diagnosed a right knee meniscal tear, lumbar disc syndrome, insomnia and headaches (A.R. 469). Dr. Rajagopalan gave Plaintiff a steroid shot in her right knee, ordered a knee brace and physical therapy, continued Plaintiff's Vicodin, and again referred Plaintiff to specialists (A.R. 469). During a September, 2012 examination, Plaintiff had tenderness and spasm and limited range of motion in the lumbar spine and right knee, with a positive McMurray test (A.R. 634-35). Dr. Rajagopalan diagnosed lumbar disc syndrome, right knee internal derangement and insomnia, prescribed Vicodin, Restoril and Mobic, referred Plaintiff to specialists, requested a right knee MRI, and extended Plaintiff's disability for six weeks (A.R. 635).

///
///
///
///

### 3. **Dr. Bakshian's Records**

The next available treatment records are from spine surgeon Dr. Sam Bakshian from February of 2013 through January of 2014 (A.R. 522-74, 637-42). Dr. Bakshian evaluated Plaintiff, reviewed the medical record and prepared an initial report dated February 25, 2013 (A.R. 525-50). Plaintiff complained of intermittent sharp right shoulder pain at 7/10 radiating to her lower back with numbness, intermittent sharp right arm pain at 7/10 radiating to her hands/fingers with numbness and tingling in her right hand, occasional moderate stabbing pain in the right wrist at 5/10, constant severe low back pain at 9/10 radiating to her hips and down her right leg to the foot with numbness, constant sharp right leg pain at 9/10 radiating to her toes with numbness in the right leg and foot, intermittent sharp stabbing pain in the right knee at 9/10 radiating to her right foot, anxiety and depression, insomnia and occasional headaches at 7/10 (A.R. 527-28). On examination, Plaintiff had tenderness to palpation of the cervical and lumbar spine and limited range of motion, a "wide-based" limp, decreased motor strength in the right side, positive L'Hermite and Spurling tests, no deep tendon reflexes in the biceps, quadriceps or Achilles, tenderness to palpation of the right shoulder, right wrist, right knee and right hip with reduced strength in the right hip (A.R. 540-48). X-rays showed mild cervical straightening and disc space narrowing at L5-S1 with early spondylosis at L5-S1 (A.R. 548). Dr. Bakshian diagnosed lumbosacral sprain/strain, disc dessication and bulging at L5-S1, right knee contusion, right ankle pain, right shoulder pain, probable myofascial pain syndrome with overlay, sleep disturbance, a "pysch disturbance no new anxiety and depression," and

cervicogenic headaches (A.R. 548). Dr. Bakshian opined that Plaintiff presented with myofascial pain syndrome and should be evaluated by a pain management specialist and a pain psychologist, noting that Plaintiff has a "presumptive diagnosis of fibromyalgia" and therefore should be evaluated by a rheumatologist (A.R. 549). Dr. Bakshian ordered continued physical therapy and requested authorization for evaluation by a rheumatologist (A.R. 549).

In April of 2013, Plaintiff complained of ongoing low back pain, but indicated she was feeling better in her wrists, shoulders and knees (A.R. 522). The right side of Plaintiff's lower back was tender on examination (A.R. 522). Dr. Bakshian recommended a trigger point injection, as to which Plaintiff was reluctant to proceed, so Dr. Bakshian referred Plaintiff for physical therapy and a rheumatology evaluation and ordered Plaintiff to remain off work (A.R. 523). In June of 2013, Plaintiff complained of ongoing pain in her low back, hips, knee, foot and ankle (A.R. 637). On examination, she was tender, but with motor strength intact (A.R. 637). Dr. Bakshian again noted that he suspected Plaintiff's pain has a myofascial origin, recommended continued pain management, and extended her disability for two months (A.R. 638).[7]

---

[7]     Orthopedic surgeon and QME Dr. Mitchel U. Silverman examined Plaintiff in May of 2013, reviewed the medical record and apparently prepared an initial report dated May 9, 2013 (which is not a part of the record), and also prepared supplemental reports dated June 19, 2013 and February 5, 2014, upon review of additional medical records (A.R. 575-95). Dr. Silverman's initial work restrictions are not detailed in the supplemental reports but are incorporated by reference (A.R. 583, 592-93). Dr. Silverman opined that Plaintiff could return to

(continued...)

In August of 2013, Plaintiff reported that she had been in physical therapy, which improved her back, but that she was still having pain in her right hip and knee (A.R. 639). Plaintiff was tender on examination, with positive Faber test, limited range of motion and tightness in her hips (A.R. 639). Dr. Bakshian continued Plaintiff's medications, recommended a right knee brace, a right hip MRI and evaluation by an orthopedic specialist (A.R. 640-41). Dr. Bakshian extended Plaintiff's disability to her next appointment, and noted that he was waiting on a rheumatologist report (A.R. 640-41).[8]

---

[7](...continued)
work with preclusion from heavy lifting (A.R. 583). Dr. Silverman stated it was "medically probable that [Plaintiff] did not require any work restrictions whatsoever" since Plaintiff completed training to be a physical therapy aid during the disability period (A.R. 593). However, in the latest report, Dr. Silverman also acknowledged Dr. Salick's finding (discussed infra) that Plaintiff has fibromyalgia syndrome, and Dr. Silverman indicated that he would defer to a QME-level rheumatologist, because rheumatological diagnoses are outside Dr. Silverman's expertise (A.R. 592).

[8] Rheumatologist and QME Dr. Allen I. Salick evaluated Plaintiff on August 7, 2013, and prepared a permanent and stationary report (A.R. 472-90). Plaintiff reported a history of total body pain onset in December of 2009, with joint stiffness and swelling, muscle aches, weakness, anxiety, depression, headaches, heartburn, acid reflux, sleep disorder and fatigue (A.R. 474). Plaintiff complained of pain in her entire body, pain from the neck radiating to the shoulders, pain in her arms, elbows, wrist and hands, upper, mid and lower back pain radiating to her hips, buttocks and down both legs, pain in her knees, ankles and feet, tingling in her hands and fingers, burning sensation in her low back, shoulders and right knee, swelling in her joints, locking and sensitivity to touch in her right knee and right hip, stiffness in her joints with swelling/tightness, mild hair loss, sensitivity to sunlight, dry eyes and mouth, differences in her senses, restless legs and spasms, nonrestorative sleep, sensitivity to cold, fatigue, depression, anxiety, loss of concentration, difficulty sleeping due to pain
(continued...)

In September of 2013, Plaintiff reported ongoing pain, accelerating the need for a right hip MRI (A.R. 551). Plaintiff reportedly was being treated by a pain management specialist (A.R. 551). Dr. Bakshian noted that he was waiting for the right hip MRI and recommendations from the pain specialist, and Dr. Bakshian ordered Plaintiff to remain off work (A.R. 552).[9]

In January of 2014, Dr. Bakshian prepared a permanent and stationary report (A.R. 559-74). Plaintiff complained of pain, headaches, anxiety, depression and insomnia (A.R. 562-63). On

---

[8](...continued)
and difficulty getting out of bed due to pain and stiffness (A.R. 474-75, 477). Plaintiff reportedly walked with an uneven gait and had muscle spasms in the neck and upper back (A.R. 477). Plaintiff reported difficulty with her activities of daily living due to her pain and fatigue, an inability to sit for more than 15 minutes or stand more than 30 minutes, difficulty grasping, gripping, lifting, carrying, twisting, bending, stooping and squatting, and difficulty with driving, self-care and performing tasks (A.R. 477-78).

On examination, Plaintiff reportedly had a normal gait but problems toe walking due to pain, reduced range of motion in the cervical and lumbar spine, 10/20 fibromyalgia tender points, and normal electrodiagnostic and laboratory studies (which ruled out inflammatory processes, radiculopathy, arthritis and other potential causes of Plaintiff's symptoms) (A.R. 480-82, 491-94). Dr. Salick diagnosed fibromyalgia syndrome according to the 2010 American College of Rheumatology criteria (A.R. 483, 486).

[9] Dr. Rajan M. Patel evaluated Plaintiff for her hip pain on November 22, 2013 (A.R. 553-58). Plaintiff complained of constant severe pain in her lower back at 9/10 radiating to her right hip and down to her foot with numbness and some popping and grinding in her hip (A.R. 555). On examination, Plaintiff had positive Labral and Faber tests, and her MRI showed some narrowing of the anterior labrum (A.R. 556-57). Dr. Patel diagnosed right hip pain secondary to a degenerative labral tear and recommended that Plaintiff try a cortisone injection to her right hip (A.R. 557).

examination, Plaintiff had tenderness to palpation of the cervical and lumbar spine with limited range of motion, tenderness to palpation of the right shoulder with pain on testing, tenderness to palpation of the right wrist and right knee, and positive Labral and Faber tests (A.R. 563-69). Dr. Bakshian added a diagnosis of right hip pain secondary to degenerative labral tear per Dr. Patel and indicated that Plaintiff was permanent and stationary (A.R. 570-71). Dr. Bakshian opined that Plaintiff is precluded from lifting 25 pounds and from "walking back and forth" (A.R. 573). Dr. Bakshian also stated that Plaintiff should avoid any work requiring pushing, pulling, climbing ladders, bending, stooping, reaching above her head, standing or walking (A.R. 573).

### 4. Treatment by Sharp Imaging Medical Group, Inc.

Meanwhile, in November of 2013, Plaintiff presented to an orthopedist at the Sharp Imaging Medical Group, either Dr. Steven N. Brourman or Norman A. Linder,[10] asking the doctor to serve as her primary care physician (A.R. 496-521). Plaintiff complained of frequent pain in her right wrist and hand with tingling and numbness, worsened with repetitive use and eased with rest and medications, intermittent aching, sharp middle and low back pain radiating to her legs with numbness and tingling, worsened with prolonged sitting, standing, bending, lifting and carrying and eased with rest and

---

[10] The report from this evaluation appears to be only a partial copy; the report does not contain a signature page to identify the doctor who treated Plaintiff. See A.R. 521 (last available page of the report).

medications, continuous pain in the right knee, frequent pain in the right ankle worsened by standing/walking, depression and difficulty sleeping (A.R. 499-500, 502). Plaintiff reportedly was taking Vicodin and anti-inflammatory medication (A.R. 501). Plaintiff claimed that the pain severely limited her activities of daily living (A.R. 503-04 (detailing same)).

On examination, Plaintiff had positive Neer's and Hawkins-Kennedy impingement tests, tenderness in the right scaphoid or lunate carpal bones and right wrist, positive Phalen's and Durkan's median compression tests, classic patterns of right carpal tunnel syndrome, increasing pain toward terminal range of motion in the thoracic and lumbar spines, right knee patellofemoral crepitus and patellofemoral and medial joint line tenderness, positive McMurray test, and decreased sensation in the right median nerve distribution (A.R. 505-16). The doctor diagnosed lumbar spine spondylosis (rule out lumbar radiculopathy), rule out right carpal tunnel syndrome, right shoulder subacromial impingement syndrome (rule out rotator cuff tear), right knee chondromalacia patella (rule out medial meniscal tear), and rule out intercarpal ligament tear right wrist (A.R. 517). The doctor requested authorization for nerve conduction studies, MRIs of the right shoulder, wrist, ankle and foot, and prescribed 800 milligram Motrin, Vicodin, Prilosec, and "extracorpeal shockwave therapy" for Plaintiff's right shoulder, knee and ankle (A.R. 518-19). The doctor found Plaintiff temporarily totally disabled (A.R. 518-19).

///

///

///

18

C. **Opinions of Consultative Examiners and State Agency Physicians**

Orthopedic surgeon Dr. H. Harlan Bleecker examined Plaintiff and prepared a Complete Orthopedic Evaluation dated July 1, 2015 (A.R. 604-09). Plaintiff complained of pain in the right side of her neck, right shoulder radiating down her right arm to all of the fingers, and low back radiating down the right leg to the big toe, aggravated by looking down, reaching, sitting, standing, walking, bending and lifting (A.R. 604). Plaintiff also complained of right knee swelling, reporting that her knee buckles and gives away, for which she wears a knee brace (A.R. 604). Plaintiff reported a history of asthma, anxiety, panic attacks, depression and fibromyalgia (A.R. 604). On examination, she had an antalgic gait on the right side, could not walk on tiptoes or heels on the right side, had limited range of motion in her neck, back (with a catch on extension), right shoulder and right knee, reduced grip strength in her right hand, and "stocking hypalgesia" in the right upper and lower extremities (A.R. 605-07). Dr. Bleecker reviewed medical records, including imaging studies, and Dr. Bakshian's January, 2014 permanent and stationary report (A.R. 607-08). Dr. Bleecker diagnosed right shoulder impingement syndrome, degenerative disc disease, lumbar spine degenerative arthritis and internal derangement of the right knee (A.R. 608). Dr. Bleecker opined that Plaintiff is capable of light work with occasional kneeling, squatting, bending and reaching overhead with the right upper extremity (A.R. 608).

///
///

Psychiatrist Dr. Maged Botros examined Plaintiff and prepared a Complete Psychiatric Evaluation dated May 28, 2015 (A.R. 597-601). Dr. Botros reviewed no medical records (A.R. 597). Plaintiff complained of panic attacks five to 10 times a day, lasting up to 10 minutes each, which assertedly have resulted in Plaintiff staying home "all the time" (A.R. 598). Plaintiff reportedly denied any current or prior symptoms of depression, mania or psychosis, and reported having no treatment by a psychiatrist or therapist (A.R. 598). Plaintiff apparently stated that she could dress and bathe herself, but does no household chores and cannot go places by herself (A.R. 599). On examination, Plaintiff had psychomotor agitation, an "okay" mood, anxious affect and she was able to recall three of five items in five minutes, with "fair" insight and judgment (A.R. 599-600). Dr. Botros diagnosed anxiety disorder (not otherwise specified), rule out panic disorder with agoraphobia (A.R. 600-01). Dr. Botros opined that Plaintiff has mild limitations in all areas of functioning, and that she had a possibility of improvement within 12 months, if treated (A.R. 600-01).

In July of 2015, State agency physicians reviewed the available record and found limitations similar to the limitations found by Drs. Bleecker and Botros (A.R. 82-94).

## II. The ALJ's Erred in the Evaluation of Medical Opinion Evidence.

In determining Plaintiff's physical residual functional capacity, the ALJ summarized the opinion evidence from Drs. Rajagopalan, Silver, Botros, Bleecker and Kan, but not the opinion evidence from Dr.

Bakshian (A.R. 23-24).  The ALJ purportedly gave "partial" weight to the workers compensation treating and examining physicians' opinions, stating:

> [The opinions] are somewhat consistent with the evidence at
> the time.  However, the more recent evidence shows some
> improvement.  [Citing Dr. Bleecker's July, 2015 consultative
> opinion at A.R. 604-13, Dr. Silver's, 2011 reports at A.R.
> 643-84, and Dr. Silverman's February, 2014 report at A.R.
> 685-96].  I afford little weight to the opinions of her
> physicians that she is disabled under the workers'
> compensation guidelines or that she is temporarily disabled.
> [Citations omitted].  The determination of disability is an
> issue reserved for the Commissioner.  These opinions are not
> entitled to controlling weight or given special
> significance.  Further, the evidence shows improvement in
> her physical condition.  The objective imaging shows no more
> than mild degenerative changes.  She reports pain and she
> exhibits an antalgic gait, but she does not exhibit any
> severe physical limitations upon examination.  [Citing Dr.
> Bleecker's consultative examination at A.R. 604-13].  The
> evidence establishes that the claimant is capable of
> activities at the light exertional level, with additional
> limitations.

(A.R. 25-26).

///

///

A treating physician's conclusions "must be given substantial weight." <u>Embrey v. Bowen</u>, 849 F.2d 418, 422 (9th Cir. 1988); <u>see</u> <u>Rodriguez v. Bowen</u>, 876 F.2d 759, 762 (9th Cir. 1989) ("the ALJ must give sufficient weight to the subjective aspects of a doctor's opinion. . . . This is especially true when the opinion is that of a treating physician") (citation omitted); <u>see also</u> <u>Garrison v. Colvin</u>, 759 F.3d 995, 1012 (9th Cir. 2014) (discussing deference owed to the opinions of treating and examining physicians). Even where the treating physician's opinions are contradicted, as here, "if the ALJ wishes to disregard the opinion[s] of the treating physician he . . . must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." <u>Winans v. Bowen</u>, 853 F.2d 643, 647 (9th Cir. 1987) (citation, quotations and brackets omitted); <u>see</u> <u>Rodriguez v. Bowen</u>, 876 F.2d at 762 ("The ALJ may disregard the treating physician's opinion, but only by setting forth specific, legitimate reasons for doing so, and this decision must itself be based on substantial evidence") (citation and quotations omitted).

The reasons the ALJ stated for rejecting the treating physicians' opinions do not comport with these authorities. First, the ALJ's reasoning is insufficiently specific. For the most part, the ALJ lumped together the multiple opinions of the workers compensation treating physicians, and the ALJ failed even to acknowledge Dr. Bakshian's opinions. <u>See, e.g.</u>, <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1038 n.10 (9th Cir. 2007) (an ALJ cannot avoid the specificity requirements for rejecting treating physician's opinion by not mentioning the opinion and making findings contrary to it).

Second, while the ALJ stated that the workers compensation opinions were "somewhat consistent" with the evidence at the time, the ALJ inferred from more recent medical records that Plaintiff's condition had significantly improved. This lay inference from medical records cannot constitute a specific, legitimate reason for discounting the physicians' opinions. See Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (an "ALJ cannot arbitrarily substitute his own judgment for competent medical opinion") (internal quotation marks and citation omitted); Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is forbidden from making his or her own medical assessment beyond that demonstrated by the record). Neither the ALJ nor this Court possesses the medical expertise to determine whether test results or fluctuating symptom reports demonstrated that Plaintiff's conditions significantly improved so as to undercut the earlier opinion evidence. The presence of a fibromyalgia diagnosis renders any such determination by a lay person particularly perilous.

As indicated above, essentially all the workers compensation treating and examining physicians who gave detailed opinions regarding Plaintiff's abilities found that she is more limited than the ALJ's

///
///
///
///
///

assessment.[11]  Plaintiff has diagnoses of, <u>inter alia</u>, fibromyalgia,
lumbar disc syndrome, right knee internal derangement, headaches,
insomnia, right ankle pain, right shoulder pain/impingement syndrome,
right hip pain secondary to a degenerative labral tear, and anxiety
disorder.  Plaintiff has received, <u>inter alia</u>, injections,
chiropractic treatment, physical therapy, and narcotic pain relievers.
The ALJ did not discuss with any specificity the extent to which the
diagnosed conditions do or do not support the limitations the
physicians found to exist.

    In sum, without a medical expert to interpret the record
evidence, the ALJ's lay inference of significant improvement cannot
furnish a specific, legitimate reason to discount the treating
physicians' opinions.

    The ALJ also erred in concluding that Plaintiff's fibromyalgia is
not a medically determinable impairment.  "[T]here are no laboratory
tests to confirm the diagnosis [of fibromyalgia]."  <u>Benecke v.
Barnhart</u>, 379 F.3d 587, 590 (9th Cir. 2004); <u>see also</u> <u>Revels v.
Berryhill</u>, 874 F.3d 648, 666 (9th Cir. 2017) (observing that
fibromyalgia is diagnosed in part by evidence showing that another
condition does not account for a patient's symptoms).  Consequently,
the presence of assertedly "mild" findings and snapshot evaluations of

_____

    [11]    The Court does not have Dr. Silverman's initial report,
which may have found lesser limitations.  The Court only has Dr.
Silverman's follow up reports suggesting that Plaintiff might not
have any work restrictions, but also indicating that he would
defer to a QME rheumatologist concerning Plaintiff's fibromyalgia
(A.R. 592-93).

Plaintiff's physical abilities, (which are inconsistent with other snapshot evaluations), cannot properly impugn medical opinions regarding fibromyalgia. See Revels v. Berryhill, 874 F.3d at 657 ("SSR 12-2p recognizes that the symptoms of fibromyalgia 'wax and wane' and that a person may have 'bad days and good days'") (citation omitted); Johnson v. Astrue, 597 F.3d 409, 410 (1st Cir. 2009) ("the musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities") (quoting Harrison's Principles of Internal Medicine at 2056 (16th ed. 2005)); McCormick v. Colvin, 2013 WL 3972700, at *15 (N.D. Iowa July 26, 2013), adopted, 2013 WL 4401853 (N.D. Iowa Aug. 14, 2013) ("Because [fibromyalgia] is a rheumatic disease, it is not diagnosed through the type of objective findings utilized with neurological orthopedic disorders. . . . In short, the fact that McCormick had relatively normal MRI findings and lacked other objective findings that would suggest neurological or orthopedic impairments does not provide a good reason for discounting Dr. Luft's opinions"); Reliford v. Barnhart, 444 F. Supp. 2d 1182, 1190-91 (N.D. Ala. 2006) ("Fibromyalgia is not diagnosed by MRI or x-rays. . . . The negative MRI and x-ray scans are meaningless in fibromyalgia cases"); Curtis v. Astrue, 623 F. Supp. 2d 957, 967 (S.D. Ind. 2009) ("The ALJ's conclusion that Plaintiff's normal MRI and normal neurological results were inconsistent with her diagnosis of fibromyalgia misunderstands the nature of fibromyalgia"); cf. Coleman v. Astrue, 423 Fed. App'x 754, 755 (9th Cir. 2011) (the ALJ erred by "rel[ying] on the absence of objective physical symptoms of severe pain as a basis for disbelieving [claimant's] testimony regarding" effects of fibromyalgia symptoms).

The ALJ's cursory rejection of Dr. Salick's fibromyalgia diagnosis is not supported by substantial evidence. Dr. Salick's diagnosis followed Dr. Bakshian's opinion that Plaintiff may have fibromyalgia. The ALJ postulated that fibromyalgia is not a medically determinable impairment because Plaintiff supposedly did not have the symptoms required under Social Security Ruling 12-2p (A.R. 20). To the contrary, as Dr. Salick explained (and as detailed in Social Security Ruling 12-2p), a person suffers from fibromyalgia if she has: (1) widespread pain that has lasted at least three months; (2) repeated manifestations of six or more fibromyalgia symptoms, signs or co-occurring conditions (e.g., muscle pain, fatigue or tiredness, headache, numbness or tingling, insomnia, depression, and anxiety disorder); and (3) other causes of symptoms have been excluded. See A.R. 483, 486; Social Security Ruling 12-2p. According to the medical records, Plaintiff (often and for years) had complained of widespread muscle pain (A.R. 326, 338, 446, 474-79, 499-500, 527-28, 555, 562, 631), fatigue (A.R. 431, 474, 479), headache (A.R. 326, 409, 431, 467, 528, 563), numbness or tingling (A.R. 326, 499, 527-28, 555, 562, 631), insomnia (A.R. 326, 338, 409, 431, 467, 502, 563, 631), depression (A.R. 502, 528, 562, 604) and anxiety (A.R. 528, 562, 604). No other rheumatologist evaluated Plaintiff. No examining or treating doctor disagreed with Dr. Salick's diagnosis of fibromyalgia diagnosis. On the present record, substantial evidence fails to support the ALJ's finding that Plaintiff's alleged fibromyalgia was not a medically determinable impairment. Accordingly, the ALJ erred by failing to consider any fibromyalgia-related limitations in assessing Plaintiff's residual functional capacity. See Revels v.

///

1  <u>Berryhill</u>, 874 F.3d at 662.[12]

2

3  **III. <u>The Court is Unable to Deem the Errors Harmless; Remand for</u>**

4  **<u>Further Administrative Proceedings is Appropriate.</u>**

5

6      The Court is unable to conclude that the ALJ's errors were

7  harmless.  See <u>Marsh v. Colvin</u>, 792 F.3d 1170, 1173 (9th Cir. 2015)

8  (even though the district court had stated "persuasive reasons" why

9  the ALJ's failure to mention the treating physician's opinion was

10 harmless, the Ninth Circuit remanded because "we cannot 'confidently

11 conclude' that the error was harmless"); <u>Treichler v. Commissioner</u>,

12 775 F.3d 1090, 1105 (9th Cir. 2014) ("Where, as in this case, an ALJ

13 makes a legal error, but the record is uncertain and ambiguous, the

14 proper approach is to remand the case to the agency"); <u>see also</u> <u>Molina</u>

15 <u>v. Astrue</u>, 674 F.3d 1104, 1115 (9th Cir. 2012) (an error "is harmless

16 where it is inconsequential to the ultimate non-disability

17 determination") (citations and quotations omitted); <u>McLeod v. Astrue</u>,

18 640 F.3d 881, 887 (9th Cir. 2011) (error not harmless where "the

19 reviewing court can determine from the 'circumstances of the case'

20 that further administrative review is needed to determine whether

21 there was prejudice from the error").

22

23     Defendant appears to contend that the ALJ's failure to find

24 Plaintiff's fibromyalgia to be a medically determinable impairment

25

26     _____

27     [12]    Defendant appears to suggest that, even if Plaintiff
suffers from fibromyalgia, the disease has not resulted in any
limitations.  The record does not support this suggestion with

28 any degree of certainty.

necessarily was harmless, relying on <u>Burch v. Barnhart</u>, 400 F.3d 676, 682 (9th Cir. 2005) ("<u>Burch</u>") and <u>Taylor v. Astrue</u>, 2010 WL 2773337, at **2-3 (D. Or. July 12, 2010) ("<u>Taylor</u>").  Defendant thereby appears to confuse a failure to find that an alleged impairment is medically determinable (the present circumstance) with a failure to find that a medically determinable impairment is severe (the circumstance in <u>Burch</u> and <u>Taylor</u>).  In assessing residual functional capacity, the Administration must consider all medically determinable impairments, even those deemed not severe.  20 C.F.R. § 404.1545(a)(2).  However, in assessing residual functional capacity, the Administration considers <u>only</u> medically determinable impairments.  <u>See</u> <u>id.</u>; <u>Butler v. Colvin</u>, 2016 WL 8232243, at *4-5 (E.D. Wash. Aug. 23, 2016) ("the ALJ found Plaintiff's fibromyalgia was not medically determinable. . . . Consequently, the ALJ did not incorporate Plaintiff's alleged limitations from her fibromyalgia into the RFC [residual functional capacity] finding. . . . [B]y classifying Plaintiff's fibromyalgia as a non-medically determinable impairment - rather than a severe or non-severe impairment - the ALJ excluded the effects of this condition when formulating Plaintiff's RFC, rendering the ALJ's RFC finding suspect") (citations and quotations omitted).  Therefore, the ALJ did not consider the effects of Plaintiff's fibromyalgia when defining Plaintiff's residual functional capacity.  <u>See</u> <u>id.</u>  Accordingly (and unlike the circumstance in <u>Burch</u> and <u>Taylor</u>), the Court is unable to conclude that the ALJ's error was harmless.[13]

///

_____

[13]     The Court also observes that the Ninth Circuit reversed the <u>Taylor</u> decision more than eight years ago.  <u>See</u> <u>Taylor v. Commissioner</u>, 659 F.3d 1228 (9th Cir. 2011).

Remand is appropriate because the circumstances of this case
suggest that further administrative review could remedy the ALJ's
errors.  McLeod v. Astrue, 640 F.3d at 888; see also INS v. Ventura,
537 U.S. 12, 16 (2002) (upon reversal of an administrative
determination, the proper course is remand for additional agency
investigation or explanation, except in rare circumstances); Dominguez
v. Colvin, 808 F.3d 403, 407 (9th Cir. 2015) ("Unless the district
court concludes that further administrative proceedings would serve no
useful purpose, it may not remand with a direction to provide
benefits"); Treichler v. Commissioner, 775 F.3d at 1101 n.5 (remand
for further administrative proceedings is the proper remedy "in all
but the rarest cases"); Garrison v. Colvin, 759 F.3d 995, 1020 (9th
Cir. 2014) (court will credit-as-true medical opinion evidence only
where, inter alia, "the record has been fully developed and further
administrative proceedings would serve no useful purpose"); Harman v.
Apfel, 211 F.3d 1172, 1180-81 (9th Cir.), cert. denied, 531 U.S. 1038
(2000) (remand for further proceedings rather than for the immediate
payment of benefits is appropriate where there are "sufficient
unanswered questions in the record").  There remain significant
unanswered questions in the present record.  Cf. Marsh v. Colvin, 792
F.3d at 1173 (remanding for further administrative proceedings to
allow the ALJ to "comment on" the treating physician's opinion).

///
///
///
///
///
///

**CONCLUSION**

For all of the foregoing reasons,[14] Plaintiff's and Defendant's motions for summary judgment are denied and this matter is remanded for further administrative action consistent with this Opinion.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: October 31, 2019.

_____/s/_____
                              CHARLES F. EICK
                    UNITED STATES MAGISTRATE JUDGE

---

[14]    The Court has not reached any other issue raised by Plaintiff except insofar as to determine that reversal with a directive for the immediate payment of benefits would not be appropriate at this time.